IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | | |
|---|---|---|
| BERNARD AZILLE et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | NO. 06-16 |

MEMORANDUM

Bartle, C.J.                                                                November 13, 2008

        Plaintiffs Bernard Azille, Bernard James, and John B. Sonson have sued defendant United States of America for damages arising out of the United States Coast Guard's allegedly negligent search efforts after Azille's boat took on water and capsized off the Virgin Islands. Before the court is the motion of the United States to dismiss the complaint based on lack of subject matter jurisdiction or, in the alternative, a motion for summary judgment under the good samaritan doctrine.

        In reviewing a motion to dismiss we accept plaintiffs' factual allegations as true and ask whether they are sufficient to state a claim for relief. United States v. Gaubert, 499 U.S. 315, 327 (1991).

I.

        The facts of this case are largely undisputed. In the early morning hours of April 22, 2004 plaintiffs departed from St. Croix en route to St. Thomas to sell a large catch of fish. Plaintiffs were aboard Azille's twenty-six foot boat, A Light in the Dark. During the trip, the container holding the one-and-a-

half to two tons of fish shifted, causing the boat to take on water at an alarming rate.  Unable to access his radio, Azille called his daughter Carol on his cell phone at 10:35 a.m.  He told her he was approximately four nautical miles south of Buck Island, which is in close proximity to the Island of St. Thomas.[1]  Carol informed her sister Cheryl who in turn called the Coast Guard and relayed this information as well as Azille's cell phone number.  By 11:05 a.m. the Coast Guard had launched a boat to find plaintiffs and had also called Azille to confirm his whereabouts.  He was unable to provide the Coast Guard with his latitude and longitude but estimated by "seaman's eye" that he and his colleagues were four to five miles south of Buck Island.  Although the Coast Guard advised him to begin throwing the catch overboard, plaintiffs delayed in doing so.  The Coast Guard also advised Azille to fire a flare in ten minutes.  He followed this instruction and ultimately fired all that he had.  The call ended when Azille's cell phone stopped working.  Azille's boat capsized approximately twenty to twenty-five minutes thereafter.  Once in the water, plaintiffs had no access to any signaling or communications devices.  The winds on April 22, 2004 were out of the east at ten to fifteen knots.

At 11:33 a.m. the first Coast Guard boat arrived in the vicinity of Azille's reported position, and a second boat was diverted to assist in the search.  At 11:45 a.m., while near Azille's claimed position, the first Coast Guard boat reported

---

1. There is another Buck Island, close to St. Croix.

seeing a possible white flare to the east, and it went to investigate. A search and rescue helicopter arrived on the scene near the reported flare at 1:52 p.m. and searched without success until 3:05 p.m. when it needed to return to its station to refuel. The search resumed at 4:11 p.m.[2] During the afternoon two other Coast Guard helicopters joined the effort. One of the helicopters deployed a datum marker buoy[3] to aid in locating plaintiffs, and another recovered it the following morning. The Coast Guard also alerted Immigration and Customs Enforcement of plaintiffs' situation and asked it to have its aircraft and boats in the area keep a lookout. The rescue operation ended for the day at 5:33 p.m.

At 6:20 a.m. the next day, the Coast Guard resumed a search by helicopter, and at 7:39 a.m. it launched a boat to assist. A private sailing vessel found plaintiffs in the water around 8:00 a.m. They were about one nautical mile south of Culebra, Puerto Rico and approximately twenty-seven miles west of the accident site. The Coast Guard calculates that it spent eighteen hours and forty minutes searching for plaintiffs and that it covered an area of approximately 192 nautical square miles.

---

2. Plaintiffs state the return time as 4:20 p.m. but this is not a material dispute.

3. A datum marker buoy is a drift tool used to determine water current in a search area. Def.'s Br. at 9-10.

II.

Plaintiffs allege that the Coast Guard was negligent in its efforts to find them.  Specifically, plaintiffs claim that the Coast Guard carelessly directed a search helicopter in the opposite direction from where plaintiffs were drifting.  The search and rescue helicopter that arrived at 1:52 p.m. was directed to search an area that was east and north of Azille's reported position (four to five miles south of Buck Island) despite the wind coming out of the east.  The helicopter resumed this search pattern after refueling while plaintiffs drifted due west.

It is well-settled that the United States enjoys sovereign immunity except where it consents to be sued.  U.S. v. Sherwood, 312 U.S. 584, 586 (1941).  The terms of that consent define the jurisdiction of a court entertaining a case against the United States.  Id.  The Suits in Admiralty Act waives sovereign immunity where a civil action in admiralty could be brought against a private person.  The Act states:

> In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation.  In a civil action in admiralty brought by the United States or a federally-owned corporation, an admiralty claim in personam may be filed or a setoff claimed against the United States or corporation.

46 U.S.C. § 30903.

The waiver of sovereign immunity in the Suits in Admiralty Act contains an implied discretionary function exception. Sea-Land Serv., Inc. v. United States, 919 F.2d 888, 893 (3d Cir. 1990). The analysis under the Suits in Admiralty Act is the same as that for the discretionary function exception under the Federal Tort Claims Act. U.S. Fire Ins. Co. v. United States, 806 F.2d 1529, 1535 (11th Cir. 1986). The purpose of the this exception, which results in the retention of sovereign immunity, is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Gaubert, 499 U.S. at 323 (internal quotations omitted).

Courts applying the discretionary function exception employ a two-part test. First a court considers whether the challenged government action is "a matter of choice," that is, a matter of discretion. Berkovitz ex rel Berkovitz v. United States, 486 U.S. 531, 536 (1988). Second, a court must determine whether the judgment or decision at issue "is of the kind that the discretionary function exception was designed to shield." Id.

Before proceeding to the two-part inquiry, a court must identify the conduct in issue. Merando v. United States, 517 F.3d 160, 165 (3d Cir. 2008). The parties agree that the conduct in question was the decision to direct a helicopter to search for plaintiffs in the area designated as A-1. See Pls.' Ex. 2; Def.'s Ex. B. Area A-1 is a rectangular search area that

includes the position Azille reported south of Buck Island, as well as an area extending to the north and east of that point. It also encompasses the area where the Coast Guard spotted the white flare.  Under Gaubert, "it is the nature of the conduct ... that governs whether the exception applies."  499 U.S. at 322 (internal quotations omitted).  Therefore, the act we focus on here is not the specific decision to send a helicopter to area A-1, but the more general decision to search for plaintiffs and the judgments made regarding how to conduct the search.  We now turn to the two-part discretionary function exception analysis.

First, we must determine whether the Coast Guard's decision about how to conduct the search was an exercise of discretion.  "A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions.  Day-to-day management ... regularly requires judgment as to which of a range of permissible courses is the wisest."  Gaubert, 499 U.S. at 325. If a regulation exists that mandates particular conduct, the government employee's action is not one involving discretion. Id. at 324.  On the other hand, if a regulation permits employee discretion, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  Id.

There was nothing mandatory in Coast Guard regulations compelling a search of area A-1.  Indeed, the Coast Guard was

-6-

under no obligation to attempt a search and rescue of plaintiffs at all.  See 14 U.S.C. § 88; Kelly v. United States, 531 F.2d 1144, 1147-48 (2d Cir. 1976).  Furthermore, the Coast Guard's decision about where and how to search for plaintiffs involved elements of choice on such things as which and how many aircraft and vessels to use and how long to search.  A decision about the area to be searched involved judgment based on Azille's reported position, information from the datum marker buoy, wind and sea current conditions, and the white flare sighting.

      The fact that these were discretionary judgments is bolstered by a review of the United States National Search and Rescue Supplement ("NSS") and the Coast Guard Addendum to the NSS ("Coast Guard Addendum"), both of which provide guidance to the Coast Guard in its search and rescue efforts.  The NSS explains:

> [Search and rescue ("SAR")] planning is both an art and a science, relying greatly on the creativity and experience of the personnel involved.  Because of the many variables encountered during SAR operations and the individuality of each SAR case, the guidance provided in this NSS must be tempered with sound judgment, having due regard for the individual situation....  Therefore, few actions or procedures discussed in this NSS are mandatory.

National Search & Rescue Committee, United States National Search and Rescue Supplement to the International Aeronautical and Maritime Search and Rescue Manual, at i (2000).  Likewise, the Coast Guard Addendum provides under the heading "Applicability and Obligation":

> Coast Guard personnel are expected to exercise broad discretion and to exercise

>     sound judgment in performing the functions
>     discussed.  The Coast Guard retains the
>     discretion to deviate from or change this
>     guidance without notice.  This document
>     creates no duties, standard of care, or
>     obligations to the public and should not be
>     relied upon as a representation by the Coast
>     Guard as to the manner or proper performance
>     in any particular case.

United States Department of Transportation, United States Coast Guard, United States Coast Guard Addendum to the United States National Search and Rescue Supplement to the International Aeronautical and Maritime Search and Rescue Manual, at PPO-7 (2004).  We thus conclude that the Coast Guard's decision to search for plaintiffs and its judgments about how to conduct the search were discretionary acts.

Second, we must decide whether these discretionary decisions are the kind of acts that the discretionary function exception is designed to protect.  In <u>Gaubert</u> the Supreme Court rejected the contention that the discretionary function exception protects only acts of negligence that occur in the course of establishing broad policies.  499 U.S. at 334.  If that were the rule "then countless policy-based decisions by regulators exercising day-to-day supervisory authority would be actionable."  <u>Id.</u>  Plaintiffs argue here that the Coast Guard's decision to direct the helicopter to area A-1 was a "mere operation act[] not grounded in social, economical or political policy."  This, however, is not the test.  Rather, in answering the question of whether a government act is the kind the exception was designed to protect, courts are directed to focus on whether the act in

question is "susceptible to policy analysis." Id. at 325. Even operational acts can be discretionary. Id. at 326. We likewise conclude that the Coast Guard's decision to attempt to rescue plaintiffs and its decisions about how to search for them are the kinds of decisions the discretionary function exception to the waiver of sovereign immunity under the Suits in Admiralty Act were designed to protect.

Courts in analogous cases to the one before us have held that the Coast Guard's decision to engage in a rescue, and its decisions regarding how to proceed in that rescue, are susceptible to policy analysis and therefore protected by the discretionary function exception. See Lewis, et al. v. United States, et al., 2002 A.M.C. 2797, 2803 (M.D. Fla. 2002); Wright v. P. J. St. Pierre Marine, Inc., 1990 A.M.C. 325 (S.D. Tex. 1989). In Lewis one of the plaintiffs had an accident while scuba diving off the coast of Jacksonville, Florida. 2002 A.M.C. at 2797. He sued the United States under the Suits in Admiralty Act for negligence in its rescue efforts. Id. The United States responded that it was immune under the discretionary function exception. Id. Lewis argued that once the Coast Guard decided to rescue him, it had no discretion to ignore the procedures stated in the NSS or the Coast Guard Addendum. Id. at 2799. The court disagreed. It held that the Coast Guard's decision to rescue Lewis and its decision on how to proceed with that rescue were protected by the discretionary function exception because they were "unquestionably 'susceptible to policy analysis.'" Id.

at 2803. "[D]ecisions regarding whether or not to commit outside resources to a rescue ... are quintessential examples of the kind of judicial 'second-guessing' and intervention in policymaking decisions that the discretionary function exception was designed to prevent." Id. at 2803-04.

Accordingly, sovereign immunity exists under the present circumstances, and we do not have subject matter jurisdiction. Plaintiffs may not recover damages against the United States for their injuries. For this reason, we need not pass upon the government's motion for summary judgment based on the good samaritan doctrine.[4]

In sum, we will grant the motion of defendant the United States of America to dismiss the complaint for lack of subject matter jurisdiction.

---

4. For a discussion of the good samaritan doctrine see Patentas v. United States, 687 F.2d 707, 714-15 (3d Cir. 1982), which adopts the definition found in the Restatement (Second) of Torts §§ 323 and 324A as a part of federal maritime tort law.